## HAMILTON COUNTY, TENN., v. DAVIS.

(Circuit Court of Appeals, Sixth Circuit. March 17, 1922.)

No. 3531.

Counties ⬅124(3)—Contract with bridge engineer in excess of amount authorized held not ratified.

Where a county, which was authorized to expend a limited amount for the construction of a bridge, contracted with an engineer to superintend the construction and to pay him a percentage on the contract price, with the understanding that his plans would not be adopted unless the bridge could be constructed under them within the limit fixed by statute, and thereafter it was found necessary to contract for additional work not called for by the specifications, which additional work cost more than the amount originally limited, and, on ascertaining that fact, the county dismissed the engineer, Private Acts Tenn. 1917, c. 26, ratifying the county's contracts in excess of the original cost of the bridge, did not ratify the contract with the engineer, if that could be construed to provide for commission on the amount of the cost in excess of the original limit.

In Error to the District Court of the United States for the Eastern District of Tennessee.

Action by Benjamin H. Davis against the County of Hamilton, Tenn. Judgment for plaintiff, and defendant brings error. Reversed and remanded for a new trial.

The county in which the city of Chattanooga is located desired to build a bridge across the Tennessee river. For that purpose the county employed Mr. Davis, the defendant in error, as consulting engineer, and agreed to pay him for his services in planning the bridge and supervising its erection a 5 per cent. commission upon its cost. In the course of the erection it was found that extensive changes were necessary in the plans and much expense was incurred beyond that contemplated. A controversy arose between the county and the engineer. He was discharged, and the work was completed under other supervision. Thereupon he brought this suit against the county in the court below, claiming that his total compensation, for his commission and extras, should have been about $73,000, admitting payments and offsets amounting to about $25,000 and asking judgment for the balance of $48,000.

Upon a jury trial he recovered a verdict of $15,000, and had judgment for that amount. The county brings the case here under a writ of error, relying in one form or another upon the defense that there had been no authority on the part of the county or its agents to make a contract for a commission upon any sum in excess of $500,000, and that, if any such more extensive contract had been made, it had not been ratified.

The basis of the controversy is found in chapter 25 of the Private Acts of 1913 (Extra Session) of the Tennessee Legislature. It provides in section 1 that the county "is hereby authorized and empowered to construct a bridge * * * and to issue and sell for the purpose of paying for the same its negotiable coupon bonds in an amount not exceeding $500,000." Upon the one side, it is claimed that the authority of the county and of its agencies was thereby limited to the erection of a bridge within the specified cost. Upon the other side it is insisted that other statutes gave the county general authority on this subject, and that the only effective limitation of this particular statute was as to the amount of bonds which could be issued for this purpose.

Shortly after the passage of the act, the proper county authority (being the county court) appointed a committee, known as the "Tennessee River Bridge Committee," with specified powers and restrictions, among which were: "(4) After the design of the said bridge is adopted by the committee and approved by the War Department, to advertise for bids for the erection of same and to

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
278 F.—38

let the contract for the building of said bridge to the lowest and best bidder, provided the total cost of the erection should not exceed five hundred thousand dollars."

Thereupon the committee advertised, requesting bridge engineers to submit competitive designs and estimates, and stated in the advertisement that the county had voted a bond issue of $500,000 for the erection of such bridge. Davis wrote the committee requesting some information, and the committee replied, saying among other things, "cost of structure complete must not exceed $500,000." On March 27, he submitted to the committee a letter in which he said: "For 5 per centum of the total cost of the bridge and approaches, inclusive of movable span, I agree to do the full and complete engineering of the structure." He then specified what the services would be, and among other things said: "Your committee shall have its own free choice as to which type of movable span it prefers and the appropriation will permit."

To this the committee replied with a letter to Davis, saying that: "Conditioned on your securing the approval of the War Department of a span for a concrete bridge, acceptable to our committee, within a reasonable length of time to be determined by the said committee, you will be awarded the contract as consulting engineer for the construction of said bridge, as per your proposal contained in your letter of the 27th of March."

Thereafter, under Davis' supervision, borings were made at points on the bank and in the river, to determine the foundation conditions for the piers, and he prepared complete plans and specifications. He reported to the committee that there were going to be several bids, and he thought they would be low enough so as to build the bridge within the appropriation. Somewhat later he applied to the committee for a payment on account of his services. In reply the committee recited the understanding between them that, if it was found that the bridge which he was designing could not be built within the appropriation, he should be paid a reasonable price for his services so far rendered, and further reciting that, since it could not be ascertained until the bids were in whether the bridge could be built within the appropriation, an advance payment was thereby offered to him, to be considered as a part of the proposed reasonable compensation in case the bridge could not be built for the sum named, or as a payment on account of the 5 per cent. commission in case a contract should be made with a bidder to construct the bridge for a price within the $500,000 limit. This payment was accepted by Davis without question as to the conditions.

When the bids were opened they were such that it was apparent that contracts could be let to responsible bidders for about $460,000 based upon Davis' estimate of quantities, and computed upon the unit plan. A formal contract was then made between Davis and the committee, by which his duties as consulting engineer were specified and the committee agreed to pay him a commission of 5 per cent. "on the total cost of the entire construction and completion of the bridge." The contract contains no reference to the proposed cost of the bridge, excepting as it says: "Upon the award of any contract or contracts for the construction of said bridge and approaches, the estimated amount of the full commission shall be determined, and one-half of the same, less total previous payments, shall then be paid."

Thereupon the committee reported to the county court that it had employed Mr. Davis at a fee of 5 per cent. of the cost of the bridge and that contracts had been negotiated with bidders for its erection at a cost of not more than $460,000, and the county court thereupon passed a resolution ratifying these building contracts. The contract with Davis is dated October 26, 1914, and the contracts with the bidders are dated one October 31st and one November 23d, but they are pursuant to the informal awards made by the committee, prior to or simultaneously with the contract with Davis; all three contracts were practically part of one transaction, and the bridge contracts included the Davis plans and specifications.

It turned out that the bridge as completed cost more than $1,000,000. Some changes were made by the committee, and for which Davis carried no responsibility, but these did not take the cost substantially above $500,000. The chief trouble was that the borings for the pier foundations, put down under Davis' supervision, had either been made unskillfully or else he had

failed to draw the right conclusions therefrom. It became necessary to carry these foundations very much deeper and to make them larger than Davis planned, and these changes gave rise to the bulk of the additional cost.

Frank Spurlock, of Chattanooga, Tenn. (Brown, Spurlock & Brown and Bartow Strang, all of Chattanooga, Tenn., on the brief), for plaintiff in error.

Carlyle S. Littleton, of Chattanooga, Tenn. (Littleton, Littleton & Littleton, of Chattanooga, Tenn., on the brief), for defendant in error.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). The questions which are specially presented are whether the committee had authority to make with Davis a contract which would entitle him to commission upon more than $500,000, and whether, if there was lack of authority, there was subsequent ratification. We take up the latter question first.

As the necessity for additional work developed, the committee accepted the situation and proceeded with the work, some of it by application of the unit clauses in existing contracts, and some of it by new and additional construction contracts. After the proceeds of the $500,000 bond issue were exhausted, the county court, on the credit of the county, borrowed from New York banks an additional $550,-000, and gave the notes or obligations of the county therefor, and thereupon paid, as far as this fund would go, the surplus cost. The county accepted and used the bridge. However, at about the time the $500,000 limit was reached, Davis was discharged, and he rendered no further service, although continually offering to do so. It is not clear—to say the least—that the county ever received the benefit or result of Davis' services beyond the extent to which they would have been due under a contract limited to $500,000.

In this situation the Legislature of Tennessee passed chapter 26 of Private Acts of 1917, the pertinent parts of which are as follows:

"Whereas, said Hamilton county, Tennessee, also owes a balance of $550,-000.00 for the work of completing the Market Street bridge across the Tennessee river at Chattanooga, which amount it is obligated by contract to pay: * * *

"Section 1. Be it enacted by the General Assembly of the state of Tennessee, that the several contracts and obligations of said county, as set forth in the preamble thereto, be, and the same are hereby in all things ratified, validated and confirmed.

"Sec. 2. Be it further enacted, that for the purpose of paying its said indebtedness, and meeting its said obligations, the said county of Hamilton, in the state of Tennessee, through its quarterly county court, be, and it is hereby authorized, empowered and directed to issue and sell four separate issues of its negotiable coupon bonds, as follows: * * *

"$550,000.00, the proceeds of which shall be used in paying off the balance of expense of completing the work of building the Market Street bridge across the Tennessee river at Market street."

The bonds were issued and sold, and with the proceeds the New York loans paid off. It is in this conduct of the county, and in this act of the Legislature, that the trial court found unquestionable ratification. We think this finding did not sufficiently distinguish between the contract with Davis and the construction contracts for the bridge,

which construction contracts had been developed into and succeeded by the New York loans.

The invalidity of the Davis contract, on the theory of ultra vires, cannot be determined once for all by the mere words of the contract. They disclose no excess of promise beyond power. There was no doubt of the authority to make the contract to pay commissions upon any sum not exceeding $500,000. It is only after the contract has been rightfully applied to an expenditure of that amount, and it is sought to apply the general language to a further sum, that the question of ultra vires arises. There is no necessary inconsistency between a concession that the contract was, for certain applications, valid from the beginning, and the claim that, for the application now involved, it was invalid from the beginning. It might need ratification for the latter effect, though not for the former.

Undoubtedly, by accepting and using the bridge (if not before), the county ratified the action of the committee in building the greater structure. Undoubtedly the Legislature ratified the—perhaps—unauthorized acts of the county in borrowing the additional $550,000 and pledging its credit therefor. But if, in truth, the committee had been authorized only to make a contract with Davis to pay him not to exceed $25,000 in commissions, and if, in truth, it had made a contract under which he might become entitled to claim $50,000, we see nothing in the action of the county, or of the state, which would ratify the expanded or unauthorized portion of that contract. The proposition seems to be that where the committee had agreed to pay Davis commissions on $1,000,000, and where it had power to agree to pay him only half that amount, and where it had pledged the credit of the county to others than Davis for $550,000 more than it had any right to do, but had not used his continuing services during the excessive expenditure, the ratification of the latter unauthorized act is also a ratification of the former. We cannot accept that conclusion. We think the court was in error in charging that there had been ratification as matter of law, and in withdrawing from the jury the question of original lack of authority. Of course, in reaching this result we have recited only the tendency of the evidence.

It does not seem advisable to undertake to determine the question of authority by the county or by the committee to make a contract which would be valid upon any basis of computation above the $500,000 limit; nor to determine whether, when all the transactions are taken together, a limitation of this kind ought to be read into the contract as being a part of the identification of the bridge about which the parties were dealing. We cannot be sure that this record satisfactorily and completely presents any issue save that of ratification.

Accordingly, the judgment is reversed and the case remanded for a new trial.